837 A.2d 944

Christopher A. DENICOLIS

v.

STATE of Maryland.

No. 4, Sept. Term, 2003.

Court of Appeals of Maryland.

Dec. 10, 2003.

Laurel A. Albin (Byron L. Warnken, Warnken, LLC, Towson), on brief for petitioner.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondent.

Argued Before BELL, C.J., and ELDRIDGE,* RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

---

* Eldridge, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled

WILNER, Judge.

Petitioner was convicted by a jury in the Circuit Court for Baltimore County of two counts of solicitation to commit murder, for which he was given concurrent sentences of 20 years in prison. Those judgments were affirmed by the Court of Special Appeals. Petitioner complains that (1) because the two charges were confusing and ambiguous, he was not given sufficient notice of the offenses charged, and (2) the court failed to inform him or his attorney of a note from the jury. We find merit in the second complaint and shall reverse for that reason. The first complaint was not preserved for appeal, but, because the issue will likely arise again when the case is retried, we shall, for the guidance of the trial court, comment on it as well.

## BACKGROUND

In the Fall of 2000, petitioner and two co-defendants—Jaffey and Horwitz—were incarcerated at the Baltimore County Detention Center, awaiting trial for several armed robberies. The prosecutor, with respect to all three, was Assistant State's Attorney Mickey Norman.[1] In late September, Jaffey and Horwitz appeared before Judge Dana Levitz and entered guilty pleas to the charges against them. Sentencing was deferred pending the preparation of presentence investigation reports. At some later time, petitioner also appeared before Judge Levitz and pled guilty to two counts of armed robbery and one count of simple robbery. Sentencing was deferred in his case as well.

On December 1, 2000, Judge Levitz sentenced Jaffey and Horwitz to 20 years in prison. Shortly before then—some time in November—petitioner, whose sentencing was set for February, 2001, acquired a new cellmate, Kenneth Moroz. Moroz had previously been convicted of second degree murder

pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Mr. Norman spells his first name "Mickey," although it appears in the transcript as "Micky."

and was on probation. He was awaiting trial on charges of credit card misuse and certain controlled dangerous substance offenses. Moroz stated that, at some point in mid-December, following the sentencing of Jaffey and Horwitz, petitioner said that he would like to have both Judge Levitz and Mr. Norman killed and, aware that Moroz had once been convicted of murder, asked whether he would be interested in committing those murders. After some haggling over the price, Moroz and petitioner agreed that Moroz would be paid $10,000 for killing Judge Levitz and $5,000 for killing Mr. Norman. In the belief that he would shortly be released on bond, Moroz advised petitioner that he would be able to commit the murders. The two discussed the deal several more times in December and early January.

On January 9, 2001, Moroz was taken from the Detention Center to be served with new charges. While in the custody of the police and in an effort to obtain some benefit for himself, he disclosed to them petitioner's plan to kill the judge and the prosecutor and gave a written statement to that effect. On January 11, Moroz was fitted with a body wire and replaced in his cell with petitioner. The two again discussed the proposed killing, although this time petitioner indicated that he was not "really pressed" about killing Mr. Norman–Judge Levitz remained the target. Petitioner advised Moroz to steal a car and drive to Buffalo after the killing and said that he would arrange for a friend there to drive Moroz into Canada. Petitioner seemed to be concerned about the long sentences Judge Levitz had imposed on his co-defendants and thought that, if the judge were killed, his case would be transferred to another judge who might be more lenient.

Based on these conversations, petitioner was charged by criminal information with two counts of solicitation to commit murder. Neither count identified the intended victim. Count I charged that, between December 14 and 16, 2000, petitioner solicited the aid of Moroz "for the purpose of committing and with the intent of committing murder." Count II was identical, except that it alleged the solicitation as occurring between January 9 and 11, 2001.

Petitioner filed an "Omnibus Motion Pursuant to Rule 4–252 Maryland Rules of Procedure," in which, among other things, he moved "[t]hat all charges against this Defendant be dismissed for that there are defects in the institution of the prosecution and in the charging documents." Nowhere in that motion, or in any other motion or submission to the court, did petitioner attempt to identify or articulate the defects he believed existed. At a hearing on the motion, petitioner sought only to suppress the taped recording of January 11, and any testimony regarding that conversation. He did not press, or even mention, any claim that the criminal information was defective.

The motion was denied, and trial commenced on October 3, 2001. In its preliminary instructions to the jury in preparation for voir dire, the judge said that the allegations "include the allegation by the State that [petitioner] had solicited an individual to murder Judge Dana M. Levitz, who is a Circuit Court judge here in Towson, on or about January 11, 2001, while incarcerated at the Baltimore County [Detention] Center." Nothing was said about any solicitation to kill Mr. Norman or about the allegation in Count I regarding the solicitation(s) occurring December 14–16, 2000. In her opening statement, the prosecutor also informed the jury that petitioner was charged with "trying to have Judge Levitz killed," and said nothing about Mr. Norman. Moroz testified about both the first conversation, in which petitioner offered $10,000 to kill Judge Levitz and $5,000 to kill Mr. Norman, and the subsequent recorded conversation that focused only on Judge Levitz. When asked about the situation with respect to Mr. Norman, Moroz testified that petitioner said that "he would only go as high as paying me a thousand dollars for knocking him off" and that he (Moroz) could not remember whether petitioner had withdrawn his request to have Mr. Norman killed. The conversation of January 11, he said, was "mainly about the judge."

Nothing more of significance was said about any solicitation to kill Mr. Norman until the judge instructed the jury at the close of evidence. Referring to the criminal information, he

said, without any objection, that the first paragraph (Count) "is alluding to the fact that [petitioner] had solicited the murder ... of Judge Levitz" and that the second Count "alleged solicitation by [petitioner] of Mr. Moroz to kill the prosecutor in the particular case ..." No exceptions were taken to any of the court's instructions, including that one. In her closing argument, the prosecutor also alluded to solicitations to kill both Judge Levitz and Mr. Norman but informed the jury that the solicitation to kill Mr. Norman had been "withdrawn," that Norman "was out of the picture," and "isn't an issue anymore." Defense counsel responded that it went beyond Mr. Norman being "dropped". He said that he did not know "where Micky Norman came from in the first place as a part of the case," and suggested that it came from Moroz, not petitioner.

Four notes were received from the jury following its retirement to deliberate. The first note, labeled Court Exhibit 2, asked "May we get clarification on this information[?] Are there (2) separate charges? 1) 1st count? 2) 2nd count? Are we deliberating on one charge only?" After discussion with counsel, it was agreed that the court would respond, in writing, that "there are two separate charges, counts, and therefore you must return two separate verdicts." That response was given. The second note, labeled Court Exhibit 3, was from the forelady, who asked that she not be referred to by name and inquired whether she was to state the verdict to the court. Without objection, the court proposed to respond that it would refer to her as "foreperson" and that she would be required to announce the verdict. Although there is no record of a written response, we presume that the court, at some point, responded as it indicated it would.

The third note asked for a definition of solicitation. That is the note at issue here. Although the note is in the record and is labeled Court Exhibit 4, the record reveals no mention of or response to it. It is not time-stamped, and apparently counsel were unaware of it until after the verdict had been taken, sentence had been imposed, and appellate counsel, while reviewing the record for purposes of appeal, discovered it in the

record. The last note, not at issue here, simply informed the court that the jury had reached a verdict.

After the jury returned a verdict of guilty on both counts, the court postponed sentencing pending receipt of a presentence investigation report. At the sentencing hearing, conducted three months later, the prosecutor, the judge, Mr. Norman, and the Division of Parole and Probation all seemed to believe that one of the solicitation counts did involve Mr. Norman. Included in the presentence investigation report prepared by the Division of Parole and Probation was a victim impact statement from Mr. Norman, in which he described the impact on him of petitioner's solicitation "to murder Judge Levitz and myself." He observed that "[u]nlike the victim of a crime who is merely a target of opportunity, I was specifically targeted as the object of the defendant's criminal endeavor, singled out because I fulfilled my professional responsibilities as a prosecutor." The very inclusion of such a statement indicates that the Division of Parole and Probation also considered Mr. Norman a victim of at least one of the solicitations. *See* Md.Code, § 11–402 of the Criminal Procedure Article (victim impact statement in presentence investigation report).

The prosecutor in the case relied in part on Mr. Norman's victim impact statement in recommending a sentence of life imprisonment "for his role in the crime of solicitation to commit murder of which he was convicted of two counts, one on the Honorable Dana Levitz *and one on Micky Norman, an Assistant State's Attorney.*" (Emphasis added). She added that the State was asking for that sentence "because we believe that solicitation to commit murder of a judge *and a prosecutor* is the kind of thing that attacks the very fabric of our criminal justice system," and that "[j]udges *and prosecutors* have to be able to do their jobs without fear of reprisal." (Emphasis added).

The judge clearly believed that one of the counts applied to Mr. Norman. Throughout his extensive comments from the bench, he repeatedly treated both Judge Levitz and Mr. Norman as victims, and, in imposing sentence, he said:

"[T]he sentence of this Court is that you are to be confined with regard to the First Count, solicitation for the murder of Judge Levitz, to a period of twenty years to be served consecutive to the sentences that you are currently serving. You are committed to the Commissioner of Correction, *with regard to the solicitation of Micky Norman,* for a period of twenty years to be served concurrent with the first sentence that I have just given, both of which will be served consecutive to the sentences that you are currently serving."

(Emphasis added).

Immediately upon pronouncement of the sentence, defense counsel, as "a housekeeping matter," advised that the two solicitations related only to Judge Levitz, whereas the sentencing was as to both Judge Levitz and Mr. Norman. The court responded, "[w]ell, we can't do that," and corrected the sentences to refer only to Judge Levitz and "not with regard to Micky Norman." No other relief was requested.

Petitioner appealed to the Court of Special Appeals, complaining, among other things, that the criminal information was defective because it failed to name the victims and was confusing, and that the court erred in receiving a note from the jury without disclosing it to counsel or petitioner. The appellate court held that the first complaint was not preserved for appellate review—that the omnibus motion contained only a bald allegation that the charging document was defective and did not state with particularity the reasons for the deficiency. With respect to the jury note, the court concluded that the record was silent as to whether a response was made or what it might have been, that it was petitioner's responsibility to establish that error had been committed, and that he failed to satisfy that burden.

We granted *certiorari* to consider both questions: (1) whether the trial court erred in permitting a trial, verdict, and sentence based on a criminal information "that failed to fulfill the constitutional requirement that all criminal defendants must be informed of the charges against them," and (2)

whether the court erred in failing to notify petitioner and counsel "of communication between the jury and the court."

## DISCUSSION

### The Jury Note

 Maryland Rule 4–326(c) (2003) requires a trial court to "notify the defendant and the State's Attorney of the receipt of any communication from the jury pertaining to the action before responding to the communication." The Rule also requires that "[a]ll such communications between the court and the jury shall be on the record in open court or shall be in writing and filed in the action." Both mandates, but particularly the first, implement, in part, the Constitutional and common law right of a criminal defendant to be present at every critical stage of trial.

 In *Midgett v. State,* 216 Md. 26, 36–37, 139 A.2d 209, 214 (1958), we held that an accused in a criminal prosecution has the absolute right to be present at every stage of trial from the time the jury is impaneled until it reaches a verdict or is discharged, and that includes the right to be present "when there shall be any communication whatsoever between the court and the jury[,] *unless* the record affirmatively shows that such communications were not prejudicial or had no tendency to influence the verdict of the jury." We have often confirmed that fundamental principle. *See Stewart v. State,* 334 Md. 213, 224–25, 638 A.2d 754, 759 (1994) ("Any communication pertaining to the action between the jury and the trial judge during the course of the jury's deliberations is a stage of the trial entitling the defendant to be present."); *Bunch v. State,* 281 Md. 680, 685, 381 A.2d 1142, 1144 (1978); *Taylor v. State,* 352 Md. 338, 345, 722 A.2d 65, 68 (1998); *Winder v. State,* 362 Md. 275, 322, 765 A.2d 97, 122–23 (2001); *Miles v. State,* 365 Md. 488, 543, 781 A.2d 787, 819 (2001). In *Stewart,* we added that this right is absolute and that "a judgment of conviction ordinarily cannot be upheld if the record discloses a violation of the right." *Stewart v. State,* 334 Md. at 225, 638 A.2d at 759. The kinds of communication that may be regard-

ed as non-prejudicial, as noted in *Midgett,* are those that clearly do not pertain to the action or to a juror's qualification to continue serving and that are of a purely personal nature. *See Graham v. State,* 325 Md. 398, 415, 601 A.2d 131, 139 (1992).

That principle is not really in dispute here. The State's position, accepted by the Court of Special Appeals, is that there is nothing in this record to indicate when or under what circumstances the note in question was received, much less whether there was any response to it, and, because the record is silent, there is no way to tell if petitioner was prejudiced by not being informed. The intermediate appellate court observed that the lack of documentation could indicate a number of things—that the court "responded to the jury's question and repeated or clarified the instructions it had previously given," or that the court had "taken no action," either because the jury reached a verdict before any response could be given or because "the court simply believed that the jury had been instructed adequately on the definition of solicitation." The State presses the point that it is the appellant's duty to preserve a record from which the error he/she claims may be documented.

It is true that a trial court's actions and decisions are generally presumed to be correct and that it is the appellant's burden to produce a record sufficient to show otherwise. *See Mora v. State,* 355 Md. 639, 650, 735 A.2d 1122, 1128 (1999) ("It is incumbent upon the appellant claiming error to produce a sufficient factual record for the appellate court to determine whether error was committed."). *See also Bradley v. Hazard Technology Co.,* 340 Md. 202, 206, 665 A.2d 1050, 1052 (1995); *State v. Chaney,* 375 Md. 168, 184, 825 A.2d 452, 461 (2003). That assumes, of course, the ability of the appellant to produce such a record, which ordinarily is the case. Here, petitioner's ability to establish the circumstances under which the note in question was received and what, if any, reaction there was to it was hampered by the fact that neither he nor his attorney were informed about the note until after the verdict was

returned, the jury was discharged, and sentence was imposed. No better record than the one that exists could be made under such a circumstance, at least for purposes of a direct appeal. Nonetheless, the record is more than sufficient to establish non-harmless error.

It is clear that a communication from the jury was received, for it appears in the record and is labeled as a court exhibit. It is also clear that neither petitioner nor his attorney were informed about the communication. That alone constitutes error. The question is whether, under the circumstances, the error is harmless—harmless beyond any reasonable doubt. The note asked for a definition of solicitation, which, in light of the differing positions of the State and petitioner and the arguments offered by each, went to the heart of the case. It was not a collateral or peripheral issue. Twice in its instructions, the court had defined the crime of solicitation, and yet the jury was still apparently uncertain.

The Court of Special Appeals posited that the trial judge may have responded to the note in some way. If he did, without consulting petitioner or his attorney, the error could not possibly be regarded as harmless, especially as we do not know what the response may have been. The appellate court also speculated that perhaps no response was given, either because the jury returned a verdict before one could be given or because the judge believed that his earlier instructions were adequate. Either prospect is pure speculation. Neither the note in question nor the last note, informing the court that the jury had reached a verdict was time-stamped, and there is no way that we or anyone else can tell how much time elapsed between receipt of the note and the jury's agreement on a verdict.[2] Once error is established, the burden is on the State

---

2. When considering the 152nd Report of the Rules Committee on October 7, 2003, we asked the Committee to consider a Rule that would require written communications to or from a jury to be date and time-stamped and that the time of any oral communications be noted in the record. Even without, or in advance of, a Rule, we strongly encourage the Circuit Courts to follow that practice.

to show that it was harmless beyond a reasonable doubt. The record must affirmatively show that the communication (or response or lack of response) was not prejudicial. *Noble v. State,* 293 Md. 549, 563, 446 A.2d 844, 851 (1982) and cases cited there. In *Taylor v. State, supra,* 352 Md. at 351, 722 A.2d at 71, we held that even an ambiguous record cannot support a harmless error argument, and if an ambiguous record is insufficient, so, surely, is a silent record. The judgments must be reversed.

### *The Charging Document*

 Solicitation is a common law crime in Maryland. The gist of the crime is "counselling, enticing or inducing another to commit a crime." *Monoker v. State,* 321 Md. 214, 220, 582 A.2d 525, 528 (1990) (*quoting Cherry v. State,* 18 Md.App. 252, 258, 306 A.2d 634, 637–38 (1973)) (*quoting* Clark and Marshall, LAW OF CRIMES 219–23 (7th ed.1967)). *See also Lewis v. State,* 285 Md. 705, 723, 404 A.2d 1073, 1082 (1979). We observed in *Monoker,* 321 Md. at 220, 582 A.2d at 528:

> "In other words, the person accused of solicitation must make an effort to coerce someone else into committing a criminal offense. The person solicited need not commit, attempt to commit, or even intend to commit the act for the solicitation to be complete. The solicitation is complete once the incitement is made, even if the person solicited does not respond at all."

As noted, the criminal information here, in each of the two counts, charged that petitioner solicited the aid of Moroz for the purpose of committing and with the intent of committing murder and gave the date or dates of the solicitations. It thus identified petitioner as the solicitor and Moroz as the person solicited and alleged as well the criminal purpose of the solicitation and the dates when the solicitations were made. The complaint is that neither count identified the victim.

 Maryland Rule 4–252 requires that certain issues in criminal cases be raised by motion filed within 30 days after the appearance of counsel in the case and directs that "if not

so raised are waived unless the court, for good cause shown, orders otherwise." Among the issues required to be raised by such a motion are "[a] defect in the institution of the prosecution" and "[a] defect in the charging document other than its failure to show jurisdiction in the court or its failure to charge an offense." Rule 4–252(e) requires that a motion, including a motion under section (a) of the Rule, "state the grounds upon which it is made" and "contain or be accompanied by a statement of points and citation of authorities." The obvious and necessary purpose of that requirement is to alert both the court and the prosecutor to the precise nature of the complaint, in order that the prosecutor have a fair opportunity to defend against it and that the court understand the issue before it. As we have observed, the "omnibus" motion filed by petitioner gave no factual or legal basis for a conclusion that there was a defect either in the institution of the prosecution or in the charging document.

It has apparently become the practice for some defense counsel to file this kind of motion, seeking a panoply of relief based on bald, conclusory allegations devoid of any articulated factual or legal underpinning, presumably in the belief that if the motion complies with the time requirement of Rule 4–252(b), compliance with Rule 4–252(e) is unnecessary. That is not the case. If a motion fails to provide either a factual or legal basis for granting the requested relief, it cannot be granted. Recognizing the time constraints under which defense counsel and *pro se* defendants often operate, however, some courts have routinely overlooked the impermissible generality of such motions and have permitted the defendant to make the complaint more specific at, or in preparation for, a hearing on the motion. Although that practice is not what the Rule anticipates and is not to be encouraged, we have not disturbed the discretion of the trial courts to permit defendants to supplement unsupported allegations in the motion at or before the hearing, at least where the State is not unduly prejudiced by being called upon to respond immediately to allegations of which it had no prior notice. Here, however, petitioner not only failed to supplement the bald,

unsupported request but failed as well even to mention it at the hearing. To the extent that a request to dismiss the criminal information because of any defect in it or in the institution of the prosecution generally was ever validly made, it was effectively withdrawn.

 The mandate of Rule 4–252(a) does not apply to the failure of a charging document to show jurisdiction in the court or to charge an offense. That is because jurisdictional challenges may be made at any time. *See* Rule 4–252(d) ("A motion asserting failure of the charging document to show jurisdiction in the court or to charge an offense may be raised and determined at any time."). The argument made by petitioner in this appeal does not directly charge, much less establish, any such jurisdictional defect, however, but rather complains about the confusion that ensued from the failure of the criminal information to identify the intended victim(s).[3] The gravamen of even the current complaint seems to be the lack of fair notice of the nature of the charges. Unquestionably, a charging document that fails to give adequate notice of the charges is deficient and subject to dismissal. *See Williams v. State*, 302 Md. 787, 490 A.2d 1277 (1985); *State v. Mulkey*, 316 Md. 475, 560 A.2d 24 (1989). That kind of

---

**3.** The question presented in petitioner's brief is "[w]hether the trial court committed reversible error when it permitted a trial, a verdict of guilty, and a sentence to result from a criminal information that failed to fulfill the constitutional requirement that all criminal defendants must be informed of the charges against them." The argument presented on that question is hardly a model of clarity. It is framed as follows: "The trial court erred by permitting a trial, verdict, and sentencing on a defective criminal information. It named two dates but named no victims-was it Levitz twice, Norman twice, once each? Counsel did not know what he was defending. On the MJOA, the trial court did not know what charge(s) was (were) before it. The trial court instructed the jury and, in lieu of a verdict sheet, gave the jury the defective charging document as its verdict sheet. The jury's two questions made clear its misunderstanding of the charges, and the court, based on its confusion, did not properly respond. The trial court imposed sentence consistent with its faulty instructions and the jury's faulty verdict. When both sides agreed that the sentence was incorrect, the trial court changed the jury's verdict to be consistent with how the trial court then believed it should be sentencing."

deficiency is the proper subject of a motion under Rule 4–252(a). It does not necessarily translate into the failure to show jurisdiction or to allege a criminal offense, however. That kind of failure would result only if the name or identification of the victim is an element of the crime of solicitation.

■ Maryland Rule 4–202(a) requires a charging document to name or describe the defendant and to "contain a concise and definite statement of the essential facts of the offense with which the defendant is charged and, with reasonable particularity, the time and place the offense occurred." The Rule does not require that any victim be named or identified. Although the Legislature has, with respect to certain crimes, crafted a form indictment that it regards as sufficient and most of those form indictments charging crimes against a person do call for the victim to be identified (*see* Md.Code, Criminal Law Article, § 1–203 (conspiracy to murder), § 2–208 (murder or manslaughter), § 2–209 (manslaughter by vehicle or boat), § 3–206 (assault, but not reckless endangerment), and § 3–317 (rape, sexual offense)), the Legislature has not chosen to prescribe such a form for solicitation. Because the crime of solicitation may arise from an incitement to commit an offense for which there may not be an identifiable victim, the name or identity of a victim is not, ordinarily, a jurisdictional prerequisite.[4]

■ Although identifying the victim in cases where there is a known victim is not a jurisdictional requirement, it is certainly a useful thing to do and may, in some circumstances, be required in order to satisfy the defendant's Federal and State Constitutional rights to fair notice. Given the record of what occurred here, this became, even if it did not begin as,

---

4. The statutory form indictment for conspiracy, a crime that has a close affinity to solicitation, provides for naming the victim where the conspiracy is to murder but not otherwise. If the name or identity of the victim of other conspiracies directed against a person is not required, identification of the victim can hardly be regarded as jurisdictional. In *Pearlman v. State*, 232 Md. 251, 260, 192 A.2d 767, 772–73 (1963), we held that the State was not required to name known victims of a conspiracy in an indictment.

such a case. There was no inherent ambiguity in the criminal information itself but, in light of the evidence pertaining to the initial solicitation to kill Mr. Norman, it seems that everyone, at one point or another during the trial and sentencing proceeding, became confused as to whether one of the counts was based, in whole or in part, on a solicitation to kill Mr. Norman. The confusion generated by the evidence regarding Mr. Norman was understandable. The law is not entirely clear whether any subsequent withdrawal or abandonment of the initial solicitation to kill him would suffice to preclude its prosecution. *See* Wayne R. LaFave, CRIMINAL LAW 492–93 (2d ed.1986); Rollin M. Perkins and Ronald N. Boyce, CRIMINAL LAW 654–58 (3d ed.1982).

When this case returns to the Circuit Court, the State, to avoid a repetition of this confusion, should either refrain from offering any evidence regarding the initial solicitation to kill Mr. Norman or make clear through particulars that both counts charge a solicitation to kill only Judge Levitz.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE JUDGMENT OF CIRCUIT COURT FOR BALTIMORE COUNTY AND TO REMAND THE CASE TO THAT COURT FOR RETRIAL; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY BALTIMORE COUNTY.

Dissenting opinion by BATTAGLIA, Judge, Joined by CATHELL, Judge.

I respectfully dissent.

In determining the existence of reversible error, this Court conducts two inquiries: (1) whether an error occurred in the trial court and, if so, (2) whether that error was harmless beyond a reasonable doubt. Under the first inquiry, as the majority correctly states, "a trial court's actions and decisions are generally presumed to be correct." Majority slip op. at 10 (citing *Mora v. State*, 355 Md. 639, 650, 735 A.2d 1122, 1128 (1999)). To overcome the presumption of correctness, the

appellant has the burden of producing a "sufficient factual record for the appellate court to determine whether error was committed." *Mora,* 355 Md. at 650, 735 A.2d at 1128; *see State v. Chaney,* 375 Md. 168, 184, 825 A.2d 452, 461 (2003); *Bradley v. Hazard Technology Co.,* 340 Md. 202, 206, 665 A.2d 1050, 1052 (1995). If the appellant establishes that error occurred, the burden falls on the State to demonstrate that the error was harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. 638, 658, 350 A.2d 665, 677 (1976).

My disagreement with the majority involves its evaluation of the first inquiry. The majority states: "It is clear that a communication from the jury was received, for it appears in the record and is labeled as a court exhibit. It is also clear that neither petitioner nor his attorney were informed about the communication. That alone constitutes error." Majority op. at 658. If the record were as clear as the majority describes it, I might agree that some error occurred. The record, however, is far from clear. In fact, of the entire record, only a single, unexplained jury note forms the basis for the majority's conclusion that the jury communicated with the judge without the petitioner's or his attorney's knowledge. That note, although signed and marked as a court exhibit, is not referenced in the transcript and bears no time stamp to indicate whether and when the court, in fact, received it. Further, the record contains no information that, if the trial judge knew of the note at all, he had time to respond to the jury's request. Without more, the petitioner failed to meet his burden of establishing trial court error.

The majority accuses the Court of Special Appeals of "speculating" that the jury returned a verdict before the jury note could have been answered. Because of its utter silence on the matter, however, the record only permits speculation, which is exactly how the majority reaches its own conclusion that the judge received the note and never discussed its existence with the petitioner or his lawyer before the jury returned its verdict. The majority offers no factual support, and none exists in the record, for the assertion that petitioner and his counsel first learned of the note *after* the jury verdict and

sentence. Instead, the majority apparently relies completely on the allegation made by petitioner's appellate counsel, who did not participate at trial and therefore also can only speculate as to what actually happened. Neither petitioner's appellate counsel, the State, nor this Court has the slightest idea how or when the jury note entered the record or, for that matter, whether error occurred.[1] As the record is insufficient to support a claim of trial court error, I would affirm the judgment of the Court of Special Appeals.

That outcome would not preclude the petitioner from seeking a remedy under the Maryland Uniform Post Conviction Procedure Act, codified as Maryland Code, Section 7–101 *et. seq.* of the Criminal Procedure Article (2001). Litigation under those provisions would take place in a forum where petitioner could develop a factual record of how the jury note entered the record, what the judge did with the note, if anything, and whether petitioner's trial counsel knew of the note before the jury verdict.

This Court recently had occasion to discuss the utility of post-conviction proceedings in developing a sufficient factual record for appellate review. In *Mosley v. State*, 378 Md. 548, 567, 836 A.2d 678, 689 (2003), the Court declined to address the merits of a claim of ineffective assistance of counsel on direct appeal because the factual record on that issue had not been adequately developed. The Court explained that, in cases involving "alleged constitutional, jurisdictional, or other fundamental violations that occurred at trial," the Maryland Post Conviction Act allows the defendant to attack the validity of a conviction collaterally "in a separate evidentiary proceeding." *Id.* at 559, 836 A.2d at 684. To that end, the Act "provides the defendant with the possibility of an evidentiary hearing, reflecting a recognition that 'adequate procedures exist at the trial level, as distinguished from the appellate

---

**1.** Only one's imagination limits the number of conceivable possibilities. It may be that the jury decided not to deliver the note to the judge and ask its question but, instead, left the note in the jury room after concluding deliberations. From there, it could have been picked up after the trial and erroneously placed in the record.

level, for taking testimony, receiving evidence, and making factual findings thereon concerning the allegations of error.' " *Id.* at 560, 836 A.2d at 685 (quoting *Wilson v. State,* 284 Md. 664, 675, 399 A.2d 256, 262 (1979)). Like in *Mosley,* the record in this case does not provide the necessary information to determine whether some fundamental error occurred at trial. Rather than relying on conjecture to reach its result, the majority should have required the petitioner to develop an adequate record for review in a proceeding best suited for that purpose.

Judge CATHELL authorizes me to state that he joins in this dissent.